**Corky Joe MAURER, Appellant,**

**v.**

**Minnesota DEPARTMENT OF CORRECTIONS, Appellee.**

**No. 93-3653.**

United States Court of Appeals, Eighth Circuit.

Submitted June 14, 1994.

Decided Aug. 18, 1994.

Rehearing Denied Sept. 15, 1994.

Paul C. Engh, Minneapolis, MN, for appellant.

Nancy L. Jones Norman, Olivia, MN, for appellee.

Before FAGG and BEAM, Circuit Judges, and BOGUE,* District Judge.

* The Honorable ANDREW W. BOGUE, Senior United States District Judge for the District of South Dakota, sitting by designation.

BEAM, Circuit Judge.

Corky Joe Maurer was convicted, after a 1991 Minnesota jury trial, of criminal sexual conduct of the third degree and sentenced to 48 months imprisonment. He appealed to the Minnesota Court of Appeals, arguing that the victim's witnesses were allowed to vouch for her sincerity, and that such vouching had deprived him of a fair trial. That court reversed his conviction. The Supreme Court of Minnesota later reinstated the conviction, finding the error harmless. Maurer then filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254. After considering the petition, the magistrate judge recommended that the writ be granted. The district court disagreed and denied the writ. Maurer appeals and we reverse.

## I. BACKGROUND

This case of alleged acquaintance or date rape arose in the following context.[1] The events of the evening in question began at about 8:00 p.m., in Redwood Falls, Minnesota, when L.S. joined some of her friends, including Maurer, in visiting various bars in a rented limousine. The group finally finished the evening at a dance. L.S. and Maurer ended up with the same ride home. They went to Maurer's trailer, where the alleged rape took place.

During the limousine ride, L.S.'s friend, Sperl, sat in Maurer's lap. Maurer unhooked Sperl's bra, squeezed her breasts, and rubbed his hands between her legs. When L.S. complained that her bra was bothering her, Maurer unhooked it for her at Sperl's behest. Everyone, including L.S., was drinking beer during the limousine ride. After the group returned the limousine, Sperl, her sister, and L.S. followed Maurer to his trailer in Sperl's car, and brought him to the dance. Sperl testified that Maurer's advances were unwanted and that she was sore later from resisting him, but her sister and others testified that Sperl seemed to be using Maurer's attentions to arouse the jealousy of the dance host, her erstwhile boyfriend, Ei-

1. Due to the nature of our review, we explain the facts leading up to the alleged rape in some detail. *See infra* at 1289.

sel. At the dance, Maurer became angry when Sperl danced with another man. Eisel intervened, and Maurer calmed down.

L.S. and Maurer then started dancing, lifting their shirts and flashing their chests at one another. At about 1:00 a.m., L.S. decided to go home. She had consumed twelve beers during the night, and was getting tired. Sperl refused to give L.S. a ride home. Maurer could not find a ride home either. Eventually another friend, Hanson, offered to give both L.S. and Maurer a ride. Sperl told L.S. not to go with Maurer. L.S. and Maurer hugged and kissed during the ride. They both exited Hanson's truck at Maurer's trailer, waved good-bye and walked inside hand-in-hand. Once inside, they continued kissing on the couch and eventually had intercourse. The only dispute is whether their ensuing intercourse was consensual or whether Maurer purposefully intimidated L.S. into the act through his demeanor and tone of voice.

The two versions of what happened inside the trailer are remarkably similar. According to L.S., once inside, Maurer took his shirt off. He and L.S. began kissing on the couch. L.S. reminded Maurer that she wanted to go home and that he had promised her a ride home. L.S. told Maurer "that kissing was fine, but [she] did [not] want to go any further," to which Maurer replied she "would like it." Maurer disrobed L.S. while she again told him that she wanted to go home. He pulled her on top of him, and they had intercourse for about twenty minutes. L.S. testified that Maurer did not have an orgasm. She testified that although she did not want to have intercourse, she did not seriously resist Maurer. She also testified that she had once been badly beaten by her ex-husband and was afraid Maurer would hurt her if she made him angry by resisting. L.S. testified that Maurer permitted her to get off of him after she refused his request for oral sex.

L.S. dressed and asked Maurer for a ride home. He refused. L.S. called a taxi, but thought the price too high. She decided to walk home. Once outside, she realized it was too cold and the walk too far. She returned, and again asked Maurer for a ride home. He refused again, so she took a taxi anyway. She left in the cab at about 3:00 a.m. She testified that she was hysterical and told the cab driver that she had been raped.

Sperl and L.S. lived in the same apartment complex. From the taxi, L.S. went to Sperl's home. Sperl had just arrived with Eisel. L.S. was visibly upset. At Sperl's suggestion, L.S. said that Maurer had raped her. She also "babbled" about her boyfriend and how she did not want him to find out about what had happened with Maurer. L.S. said she did not want Sperl to call the police because she did not want her children to find out either. L.S. went home with a friend, and Sperl and Eisel went to the police station. An officer went to L.S.'s home and took a statement at about 4:30 a.m. She was crying when the officer arrived. There was no bruising or trauma on her body. Her clothing apparently was not torn. Officers arrested Maurer that morning. They also interviewed the now-deceased cab driver who said that L.S. had not told him that she had been raped.

Maurer testified that during the ride home in Hanson's truck, L.S. asked Maurer if she could stay with him. He told her that would be fine. After arriving at the trailer, L.S. and Maurer sat on the couch discussing the evening and having several more drinks. They subsequently engaged in mutual foreplay and had consensual intercourse. Maurer testified that during the sex act, L.S. abruptly changed her mind about continuing. She disengaged and they dressed. She requested a ride home and became angry when he declined due to his intoxication and fear of a receiving a D.W.I. citation. When L.S. became further upset over the price of a cab, Maurer offered to split the cost with her. After she left, he smoked a cigarette, went to bed, and was awakened the next morning by police.

The trial was essentially a credibility contest between Maurer and L.S. To bolster L.S.'s credibility, the prosecution, over the defense's continuing objections, asked each of the four prosecution witnesses to whom L.S. complained of rape whether L.S. seemed sin-

cere when she said she was raped.[2] Each witness replied that L.S. was sincere. In closing, the prosecution went through these witnesses' testimony and emphasized that they considered L.S.'s complaint of rape to be sincere.

Maurer claims that the trial court's admission of the "vouching" testimony and admission of other crimes evidence denied him due process of law.

## II. DISCUSSION

### A. Vouching Testimony

Maurer contends that the prosecution witnesses' testimony that L.S. was sincere, and the prosecution's use of that testimony, rendered his trial fundamentally unfair. The Minnesota courts have decided, and the state concedes, that the trial court erred in allowing such "vouching" testimony. *See State v. Maurer,* 491 N.W.2d 661, 662 (Minn.1992); *see also United States v. Azure,* 801 F.2d 336, 340–41 (8th Cir.1986) (it is hornbook law that opinion testimony as to the credibility of a particular statement is inadmissible and invades the jury's exclusive province of determining the credibility and weight of any evidence). We, however, do not concern ourselves with state evidentiary errors on habeas. Our sole concern is whether the particular evidence admitted infringed on "a specific constitutional protection or was so prejudicial as to deny due process." *Hobbs v. Lockhart,* 791 F.2d 125, 127 (8th Cir.1986). In this case, we must decide whether the "vouching" testimony invaded the jury's credibility determination to such an extent that it denied Maurer due process of law. *Id.*

To make this determination, we "review the totality of the facts in the case and analyze the fairness of the particular trial under consideration." *Id.* at 128. When the evidence is close, it is more likely that evidentiary error will infect a trial with fundamental unfairness. *See id.; United States v. Stuart,* 923 F.2d 607, 612 (8th Cir.), *cert. denied,* 499 U.S. 967, 111 S.Ct. 1599, 113 L.Ed.2d 662 (1991). Also important are the manner in which the complained of evidence was presented, whether the evidence was highly persuasive, whether it was used in closing argument, and whether the defense was able to effectively counter it. *See United States v. Roy,* 843 F.2d 305, 309 (8th Cir.), *cert. denied,* 487 U.S. 1222, 108 S.Ct. 2881, 101 L.Ed.2d 916 (1988); *Azure,* 801 F.2d at 341.

Besides Maurer's and L.S.'s testimony as to what happened in the trailer, there were only four bits of independent corroborative evidence presented at trial to help the jury determine whose version of events to believe. First, there was evidence that Maurer lost his driver's license after receiving a D.W.I. citation. He was unable to secure a work permit and, after driving his semi-truck for a period of months without a license, he applied for and received another driver's license using his nickname, "Corky" Maurer, instead of his real name, "Grady" Maurer. Maurer's license was suspended for three months when the deception came to light a number of years later. The state presented the evidence of Maurer's falsification of his name to show that Maurer is untruthful. However, this incident also supports Maurer's version of the events. This evidence is therefore equivocal at worst, and could even be considered exculpatory.

Second, after reviewing the state of the evidence, the trial court allowed evidence of other crimes to show a common scheme or plan. Minnesota allows such evidence only if the state's case is weak and the evidence is deemed crucial to the state's burden of proof. *State v. DeWald,* 464 N.W.2d 500, 504–05 (Minn.1991). The evidence was that in June 1990, Maurer met a woman at a bar with whom he eventually had intercourse. The woman testified that at about 7:00 p.m. Maurer passed her a card with the message of "[i]f you want to go to bed with me, keep this." She returned the card. He then bought her a drink. After he sent her a second drink, she approached him and introduced herself. Between seven and closing time, Maurer bought her eight drinks. Although she had a vehicle, she was intoxicated and did not want to drive. She therefore either requested or accepted Maurer's offer

2. These witnesses were Sperl, Eisel, a police officer, and a deputy sheriff.

of a ride home. On the way, they stopped by the empty bar that Maurer was in the process of purchasing and remodeling. They danced to music from the jukebox and watched T.V. Maurer proceeded to show her the bar's addition, where he lived at the time. She testified that Maurer then told her in a changed voice to take her clothes off, which she did, while protesting that she was a married woman with three children. She testified that he then got on top of her and pushed her legs apart while she tried to keep them together so that he could not enter her. Maurer then tried to get her to give him oral sex. She next remembered noticing that Maurer was asleep, so she gathered her clothes and went into the bathroom to clean up. The phone did not work, so she ran to a girlfriend's house, went home to tell her husband, and went to the hospital. No charges were filed in that incident until after the present case was filed. This evidence was offered to show that Maurer's "common plan or scheme" is to ply his victims with alcohol and then isolate them through an insincere offer of a ride home. We do not find this evidence overwhelming. It could simply show that Maurer has previously courted a woman with commitments to another and who later regretted her actions.

Third, when Maurer was arrested, a small quantity of marijuana was found in his bedroom closet. L.S. testified that when she requested a cigarette, Maurer brought her a marijuana cigarette, which she refused. Maurer denied bringing out any marijuana. The presence of marijuana is consistent with L.S.'s version of events, but is not inconsistent with Maurer's. Maurer's possession of marijuana is basically irrelevant to whether Maurer and L.S. had consensual or nonconsensual intercourse.

Fourth, was the taxi driver's statement that L.S. had not been hysterical and had not told him that she had been raped. This statement directly contradicted L.S.'s testimony.

Thus, the evidence was extremely close and the jury's determination of whose story to believe was, by necessity, based largely, if not exclusively, on the determination of Maurer's and L.S.'s truthfulness.[3] The importance of the credibility determination justifies enhanced scrutiny of the testimony concerning L.S.'s sincerity. The prosecutor asked each of the four witnesses to whom L.S. complained of rape whether she was sincere in her complaint. The "vouching," therefore, occurred not just once, but repeatedly. Further, the trial court overruled each of the defense's objections to those questions. Finally, the prosecutor emphasized the witnesses' opinion that L.S. was sincere a number of times during closing argument.

The Minnesota Supreme Court found this "vouching" testimony improper, but harmless because "one would expect [such] witnesses to say" that an alleged rape victim was sincere or truthful. *State v. Maurer,* 491 N.W.2d at 662. This finding depends on circular reasoning. One would only expect a witness to testify that a victim's complaints were sincere if one assumed that the victim had been raped. The expectation assumes the ultimate issue. If one assumed that a victim had not been raped, one would not expect the witnesses to respond that a victim was sincere. Thus, in a case such as this, where the jury was required essentially to weigh one person's word against another's, the answers to such questions were not foregone conclusions minimally affecting the determination of which story to believe. The answers to such questions were among the few external facts on which the jury had to hang its collective hat.

Given the closeness of the case, the state of the evidence, and the manner in which the improper "vouching" testimony was repeatedly solicited and reemphasized in closing argument, we cannot find that such testimony was harmless. Further, we find that it was probably crucial to the jury's ultimate determination. If the witnesses had testified that L.S. was not sincere, we have little doubt that Maurer would have been acquitted. The prosecution asked these improper questions only because it was impor-

3. In its brief, the state presents its perceptions of Maurer's demeanor while testifying. We remind the state that we may consider only that information reflected in the record.

tant to bolster L.S.'s credibility. This was also why the "vouching" was argued in closing. The solicitation and use of this testimony was improper, and under the circumstances, infected the proceeding with fundamental unfairness.[4]

### B. Other Crimes Evidence

While we need not address this issue because we find that the "vouching" testimony rendered Maurer's trial fundamentally unfair, we agree with the district court that the admission of the other crimes evidence did not abridge Maurer's constitutional rights. *See* 8th Cir.R. 47B.

## III. CONCLUSION

Because Maurer was denied due process of law, we reverse the district court. We direct that court to issue the writ, subject to the state retrying Maurer within a reasonable time.

FAGG, Circuit Judge, concurring.

I concur in the court's conclusion that the vouching testimony of the prosecution's witnesses denied Maurer due process of law.

4. On habeas, we review constitutional errors to which state courts have applied the strict harmless error analysis set out in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (harmless beyond a reasonable doubt) under the more forgiving standard set out in *Brecht v. Abrahamson,* —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (substantial or injurious effect or influence in determining the jury's verdict). *See Starr v. Lockhart,* 23 F.3d 1280, 1292 (8th Cir.1994). It is unclear whether the Minnesota Supreme Court applied *Chapman* analysis when it found the "vouching" error to be harmless. *State v. Maurer,* 491 N.W.2d 661 (Minn. 1992). However, an evidentiary error which so infects the trial that it rises to deprivation of due process necessarily satisfies either *Chapman* or *Brecht* analysis.