STATE of Minnesota, Respondent,

v.

Alonzo FERGUSON, Appellant.

No. C7–97–165.

Supreme Court of Minnesota.

July 9, 1998.

Rehearing Denied Aug. 3, 1998.

Hubert H. Humphrey III, Attorney General, St. Paul, Michael O. Freeman, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, for Respondent.

Frederick J. Goetz, Minneapolis, for Appellant.

## OPINION

PAUL H. ANDERSON, Justice.

In the early morning hours of September 24, 1994, seven gunshots were fired through the dining room window of a south Minneapolis home. One bullet hit Allen Wheatley Jr., who died later that morning. Two days after the shooting, police arrested appellant Alonzo Ferguson for the murder. Ferguson denied any knowledge of the shooting, and the police subsequently released him. Almost 21 months later, the Hennepin County Attorney filed a criminal complaint against Ferguson, based on new evidence, charging him with the murder of Wheatley. A grand jury then indicted Ferguson for first-degree premeditated murder, and a jury found him guilty of that charge. The district court sentenced Ferguson to life imprisonment.

Ferguson filed a motion for a new trial, arguing that certain evidence was improperly admitted and that the evidence as a whole was insufficient to support the verdict. The district court denied the motion, and Ferguson filed a notice of appeal with this court. In his appeal, Ferguson contests the admission of (1) a statement that Allen Wheatley Jr. made before his death that was admitted as a dying declaration; (2) photographs of alleged gang graffiti, along with testimony explaining the graffiti; and (3) vouching testimony. Ferguson argues that the erroneous admission of this evidence was not harmless beyond a reasonable doubt, and he contends that the evidence is insufficient to support the verdict. We affirm Ferguson's conviction.

Allen Wheatley Jr. had a large extended family. His father, Allen Wheatley Sr., had seven siblings, including Vincent Wheatley and Kenneth Wheatley. Allen Jr. had several cousins as well, including Jabar Wheatley and Prentice Wheatley. Allen Sr., Allen Jr., and Jabar, all of whom lived in Chicago, arrived in Minneapolis in the early morning hours of September 24, 1994, and went to Vincent's house in north Minneapolis. The four of them then went to Kenneth's house in south Minneapolis. At some point, the four men met Prentice. When the group reached Kenneth's house, Kenneth and his wife, Angela Wheatley, answered the door and invited them in.

After visiting for a while, Allen Sr. indicated that he wanted something to drink, so the six men decided to go to a bootlegger's house located down the street. The three brothers—Allen Sr., Vincent, and Kenneth—walked as one group, and the three cousins—Allen Jr., Jabar, and Prentice—walked as another. Along the way, the three brothers encountered Alonzo Ferguson, a friend of Prentice. Ferguson asked where Prentice

was, and the brothers told him that Prentice was just up ahead. Ferguson then joined the three cousins. Prentice introduced him to the group, and they all shook hands. While walking back to Kenneth's house, Ferguson noticed that Allen Jr. and Jabar were wearing blue. He told them that they were in Rolling 30s Bloods territory, and that people in the neighborhood might start trouble over gang colors. Ferguson testified that he believed he was giving friendly advice, and Jabar in fact took it as simple advice. Allen Jr., however, did not. He got upset and told Ferguson that he would wear whatever he wanted. As they reached Kenneth's house, Prentice tried to intervene in the dispute, and Ferguson left.

Meanwhile, the three brothers had already returned to Kenneth's house and went to the basement to listen to music. While in the basement, they heard a commotion upstairs and came up to see what was happening. They found the three cousins arguing in the living room. Allen Jr. was upset because he believed that Prentice had taken Ferguson's side in the argument over colors. Prentice then got up and left. Shortly thereafter, Vincent and Kenneth left the house to get cigarettes.

Inside the house, the phone rang. Angela answered the phone in the kitchen and discovered that it was her cousin's ex-boyfriend, who had been calling repeatedly throughout the day. She hung up the phone and within minutes it rang again. This time, Allen Jr. answered the kitchen phone and told the ex-boyfriend to quit calling. Allen Jr. then hung up the phone and began to walk from the kitchen into the dining room. Just then, gunshots came through the blind-covered dining room window on the side of the house. Upon hearing the gunshots, the other family members dived to the floor and avoided injury. But Allen Jr. was shot in the stomach. The family members then helped Allen Jr. away from the window and up the stairs. Allen Jr. told his cousin Jabar that "he was going to fight. He was going to be okay."

The first police officer at the scene, Officer Andrew Stender, went to check on Allen Jr., who was lying on the floor in an upstairs bedroom. Officer Stender asked Allen Jr.

how he was doing, and Allen Jr. said, "It's not good." Allen Jr. was opening and closing his eyes, and Stender believed that he was fading in and out of consciousness. Stender asked Allen Jr. who shot him, and he responded, "It was the Bloods." Allen Jr. was taken to the hospital and died within hours from the gunshot wound. Meanwhile, the police searched the crime scene. Outside the dining room window, they found five shell casings from a 9-millimeter Luger. The police also questioned the Wheatley family members.

Two days after the shooting, the police asked Ferguson to come to the police station, where he was questioned about the murder. Ferguson claimed to know nothing about the murder, denied having any confrontation with Allen Jr. over gang colors, and contended that he was home in bed at the time of the shooting. That same day, the police arrested Ferguson and searched his house. The police investigators found no weapons or bullets in the house; however, they photographed a dresser in Ferguson's bedroom that was covered in gang graffiti. After two days, the police concluded that they did not have enough evidence to charge Ferguson with the murder and released him.

Over one year later, in late November 1995, the police arrested a former Bloods gang member, Johnny Edwards, for aggravated robbery. On December 6, while still in police custody, Edwards contacted the police and told them that he had information on several gang-related crimes, including the murder of Allen Wheatley Jr. Based on information from Edwards, the police again began investigating Allen Jr.'s murder. A police officer compiled a photo lineup that included Ferguson. On January 10, 1996, the police showed this lineup to Kenneth Wheatley, but he could not pick out Ferguson as the person the three brothers had met on the street the night of the murder. The police met with Jabar Wheatley in Chicago on March 15. They showed Jabar the photo lineup, but he could not identify Ferguson, saying that it was too long ago to remember what the man in the street looked like.

Three months later, on June 17, 1996, the Hennepin County Attorney charged Fergu-

son with second-degree intentional murder and felony murder. The state theorized that Ferguson, a Bloods member, killed Allen Jr., a member of the rival gang, Black P Stone, because of the confrontation they had over gang colors. On June 20, both the Minneapolis Star–Tribune and the St. Paul Pioneer Press ran stories on local gang activity and included a picture of Ferguson, identifying him as the person charged with Allen Jr.'s murder. In July, before the grand jury hearing, the police showed Allen Sr. the photo lineup, and at that time he positively identified Ferguson as the person he and his brothers had met in the street the night of Allen Jr.'s murder. On July 16, a Hennepin County Grand Jury indicted Ferguson for first-degree premeditated murder.

The defense made a pretrial motion to exclude from evidence Allen Jr.'s statement "[i]t was the Bloods," arguing that because Allen Jr. did not believe his death was imminent, the statement was inadmissible hearsay not within the dying declaration exception. Further, the statement lacked foundation because it was pure opinion and conjecture. The defense also argued that the statement had little probative value and a great danger of unfair prejudice, and thus was inadmissible under Minn. R. Evid. 403. The state responded that Allen Jr.'s death was indeed imminent, and contended that at the very minimum the statement was an excited utterance under Minn. R. Evid. 803(2). In addition, the state argued that because Allen Jr. said that the Bloods had the motive to commit the crime, the statement was a permissible lay opinion under Minn. R. Evid. 701. The court denied the defense motion to suppress the statement.

Angela Wheatley, Allen Jr.'s aunt, testified about Ferguson's confrontation with Allen Jr. When describing the argument outside the front door between the three cousins and another man, she testified that she could hear men arguing, but could not hear what the men were saying. She admitted on redirect examination, however, that when she gave a statement to the police on the day of the murder, she said that she had heard the other man say, "I'll be back."

Allen Wheatley Sr. testified next. Although he identified Ferguson in the photo lineup in July 1996 and in the courtroom at trial, the defense questioned him about his original statement to the police. On cross-examination, Allen Sr. admitted that the day after the murder, he told police that he could not describe the person he saw in the street because the encounter was just in passing, although he did tell the police that the man had on a light brown jacket and dark jeans.

Jabar Wheatley was the next Wheatley family member to testify. The defense questioned him about the various statements he made regarding the events on the night of the murder. On the day after the murder, Jabar had told the police that he could not remember what the man looked like. The most he could say was that the man was "short and black." At trial, however, Jabar testified that Prentice had introduced Ferguson as "Alonzo" and that Ferguson was wearing a tan jacket, black pants, and a black baseball cap. Jabar also testified that after Ferguson and Allen Jr. ended their argument, Ferguson ran away between the houses and yelled "I'll be back" three times. When the defense presented its case, it questioned a police officer about Jabar's statement given the morning of the murder. The police officer testified that Jabar told the police that after the dispute, the cousins and the person they had argued with merely went their separate ways.

Kenneth Wheatley testified that he was not wearing his glasses the night of the murder and could not positively identify Ferguson as the person they met in the street. Kenneth testified that when he and Vincent left the house a second time to get cigarettes, they saw Prentice in the alley talking to some people in a car. The two brothers walked back to the alley, and while they did so, the car pulled away. Prentice told Vincent and Kenneth that the people in the car were asking him about what had happened. Prentice then left through the alley, and Vincent and Kenneth returned to their car out front. According to Kenneth's trial testimony, Prentice was angry when he left. After returning to their car, Vincent told Kenneth that he thought he saw someone

between the houses. The two brothers then went back to the alley to look around, but they saw no one. In his statement the day after the murder, however, Kenneth told the police nothing about this.

Prentice Wheatley did not testify at trial; therefore, Vincent Wheatley was the only member of the Wheatley family who both knew Ferguson before the night of the murder and testified at trial. Vincent claimed that on the night of the murder, he and his brother Kenneth left the house right behind Prentice and, once outside, observed two or three cars in the alley behind the house. He testified that Ferguson was not back there. Vincent heard the other men in the alley ask Prentice where his cousin Allen Jr. was. A man in the alley said, "Everything cool," and then the men got in the cars and left. Prentice left, and Vincent and Kenneth walked back to the front of the house and got into their car. Vincent then saw two men on the side of the house. He testified that one man had on a striped flannel shirt that was maroon or black-red, and the other had on a red bandanna. Vincent also testified that the man in the flannel shirt appeared to be Ferguson. Vincent and Kenneth then walked back to the side of the house, but they could not find anyone, so they went back to their car and drove away. After they had driven about a block, they heard a gunshot, but continued on to get cigarettes. When they returned shortly after 5:00 a.m., they found an ambulance in front of Kenneth's house.

The police informant, Johnny Edwards, testified about talking with Ferguson the morning of the murder. He testified that early in the morning of September 24, 1994, just as it was getting light out, he saw Ferguson and fellow Bloods member Marques Bowie. Edwards testified that Ferguson told him that he had been in an argument with Prentice's cousin, who was a member of Black P Stone, a rival gang. Ferguson told Edwards that he was "going to go over there and pop kill that nigger and whoever was in the way." Edwards stated that Ferguson had a .45 caliber automatic weapon and that Bowie had a .25. Edwards also testified that he saw Ferguson again later that same day. At that time, Ferguson told Edwards that he

had crept through the backyard of Kenneth's house, looked in the back window, saw the shadow of Allen Jr. walking from the kitchen into the dining room, and then started shooting. The day after giving this statement to the police, Edwards was released from jail. At the end of his testimony, Edwards read aloud his agreement with the prosecutors stating that he agreed to provide complete, truthful, and accurate information.

In contrast to Edward's testimony about Ferguson's and Bowie's weapons, a forensic firearms and toolmark examiner from the Minneapolis Police Department testified that the casings found outside the Wheatley house came from a 9-millimeter Luger and that the bullet recovered from Allen Jr. came from a .380 caliber or a 9-millimeter gun. The expert testified that the casings and bullets could not have come from either a .45 or a .25 caliber handgun. The defense also attempted to undermine Edward's testimony that he saw Ferguson when the sun was coming up by introducing evidence that the sun did not rise until 7:02 a.m. that day and that Allen Jr. was shot around 5:00 a.m.

Officer Andrew Stender, the first police officer at Kenneth's house after the shooting, described at trial the scene at Kenneth's house. Allen Jr. was opening and closing his eyes, leading Stender to believe that Allen Jr. was fading in and out of consciousness. Stender asked Allen Jr. how he was doing, and Allen Jr. responded, "It's not good." Stender then testified that Allen Jr. told Stender "[i]t was the Bloods" who shot him. On cross-examination, however, Stender admitted that Allen Jr. may have just been guessing about his shooter.

Sgt. Pete Jackson from the Minneapolis Police Department testified about questioning Ferguson at the police station on September 26, 1994, two days after the murder. The defense objected to this testimony, arguing that Jackson's testimony would vouch for the state's witnesses. Over the defense's objection, the district court allowed the transcript of the questioning to be read at trial; the state read the questions Jackson asked, and Jackson read the answers Ferguson gave. The court instructed the jury, however, that Jackson's questions were not to be

considered as evidence. Rather, the questions were only to provide context for Ferguson's answers. In the transcript of the questioning read to the jury, Jackson repeatedly stated that the other witnesses were telling the truth and asked Ferguson why he was lying about the murder.

Sgt. Jackson also testified about the search of Ferguson's house that occurred the same day. He testified that the police found a tan jacket and several dark-colored caps. They found no weapons, no bullets, no striped flannel shirt, and no maroon or black-red shirt. Jackson further testified that the police tried to interview Marques Bowie, but Bowie refused to cooperate with the police.

After Sgt. Jackson testified, the state rested its case, and the defense moved for an acquittal, arguing that there was insufficient evidence to support a guilty verdict. The defense also reiterated its objection to the reading of the transcript of Jackson's questioning of Ferguson, again arguing that Jackson was vouching for the credibility of the state's witnesses. The district court denied the motion and again ruled that the testimony was properly admitted.

The defense called four witnesses for its case-in-chief. Two police officers testified about the initial statements made by members of the Wheatley family at the crime scene. Then the defense called Ferguson to the stand. Ferguson admitted that he was not truthful in his statements to the police when he told them that he had not had a confrontation with Allen Jr. and that he knew nothing about the shooting. He explained that he was only 18 years old at the time, and he was "scared" and "panicked" when the police questioned him. He then admitted that he had a confrontation with Allen Jr. over the colors Allen Jr. was wearing and told Allen Jr., "Man, some people around here, they trip on colors," and advised him that he should not be wearing blue in Bloods territory. In front of Kenneth's house, Allen Jr. told Ferguson that he would wear whatever he wanted, and Ferguson said, "I'm going to go home" and left. He testified that it took him 25 to 30 minutes to walk home, and when he got home he rang the doorbell because he had lost his key. His mother let

him in, he got something to eat, and then he went to sleep. Later that morning, his mother woke him up and told him that Prentice Wheatley's cousin had been shot. Ferguson testified that he did not shoot Allen Jr., nor did he tell anyone to shoot him. Further, he testified that he was not a Bloods member. Finally, Ferguson stated that he and Prentice were good friends, and that he "consider[ed] him family."

The defense then called Ferguson's mother to testify. She testified that Ferguson rang the doorbell at her house in the early morning of September 24, 1994. She did not know exactly what time it was, but it was still dark outside. She stated that later that morning, Prentice's mother called to tell her that Prentice's cousin—Allen Jr.—had been shot and that she was looking for Prentice. After receiving this call, Ferguson's mother woke Ferguson to tell him about the shooting. She testified that Ferguson was surprised to learn of the shooting. She also testified that Ferguson was not a Bloods member. On cross-examination, the state asked her if she had ever seen gang graffiti in her home, but she responded that she did not know what graffiti was. After this testimony, the defense rested.

The state then requested to reopen its case because it wanted to present testimony about gang graffiti found at the Ferguson house to rebut Ferguson's and his mother's testimony that he was not a Bloods member. The defense objected, arguing that this was extrinsic evidence on a collateral issue, duplicative, and overly prejudicial. The district court allowed the testimony.

The state called Sgt. Jackson back to the stand. Jackson testified that when searching Ferguson's house on September 26, 1994, photographs were taken of a dresser in Ferguson's bedroom. The dresser was covered with a substantial amount of red gang graffiti, the meaning of which Jackson explained to the jury. Jackson explained that "CK" with the "C" crossed out stands for Crip Killer and that the Crips were the Bloods' main enemy. "Down and dirty from the 30s" is a phrase that the south Minneapolis Bloods use, and "187" is the section number of California's murder statute. The defense then moved for

a mistrial, asserting that the testimony violated Rule 403 because it was overly prejudicial, but the state responded that the gang evidence tended to prove motive. The district court denied the defense motion. As surrebuttal, the defense recalled Ferguson's mother, who testified that she did not know what the term "graffiti" meant, which was why she had not admitted that there was gang graffiti at her house.

The jury began deliberations on the morning of December 10. That afternoon, they asked the court to read portions of Johnny Edwards' testimony, and the court complied. The jury returned its verdict at 6:50 p.m. that same day, finding Ferguson guilty of first-degree premeditated murder. The court proceeded immediately to sentencing. The court asked Ferguson if he had anything to say, and he said he was sorry for what happened, but "I had nothing to do with this." The court then sentenced Ferguson to the mandatory sentence of life imprisonment for a minimum of 30 years.

The defense filed a post-trial motion for a new trial on December 24, 1996, arguing that Allen Jr.'s statement was improperly admitted as a dying declaration; the testimony explaining the gang graffiti was improperly admitted; there was improper vouching for the credibility of the state's witnesses; the state's final argument was improper; and the evidence did not support the verdict. After hearing arguments from both sides, the district court denied the motion. The court concluded that the contested evidence was properly admitted and that the evidence supported the verdict. The court stated that it could understand how a jury could have a reasonable doubt in this case, but also that it could understand how a jury could find Ferguson guilty. The jury had explained to the court after its deliberations that it listed 54 items to discuss before it took its first vote, that it waited until 4:00 or 5:00 p.m. before taking its first vote, and that at that point the vote was unanimous. Therefore, the court concluded that the jury had properly evaluated the evidence before reaching its verdict.

Ferguson filed a notice of appeal to this court. Ferguson again raises the same issues that he raised in his motion for a new trial: his trial was marred by evidentiary errors, the errors were not harmless beyond a reasonable doubt, and therefore his conviction should be reversed. Further, he argues that the evidence was legally insufficient to support his conviction.

## I.

This court applies a deferential standard when reviewing a district court's evidentiary rulings. "[R]ulings on evidentiary matters rest within the sound discretion of the trial court." *State v. Olkon,* 299 N.W.2d 89, 101 (Minn.1980), *cert. denied,* 449 U.S. 1132, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981). Therefore, this court will only overturn a district court's evidentiary ruling if that court abused its discretion. *State v. Edwards,* 485 N.W.2d 911, 914 (Minn.1992).

*a. Allen Wheatley Jr.'s statement "[i]t was the Bloods."*

The state argues that Allen Jr.'s statement "[i]t was the Bloods" was properly admitted as a dying declaration, or, alternatively, that it was an excited utterance. Ferguson contends that the statement was not admissible as a dying declaration because Allen Jr. did not believe his death was imminent, nor was it an admissible excited utterance. He also argues that the statement lacks the required foundation of personal knowledge because Allen Jr. did not have the opportunity to view his shooter.

Ferguson asserts that Allen Jr.'s statement "[i]t was the Bloods" was inadmissible as a dying declaration because there was no evidence that Allen Jr. believed he was going to die. Under Minn. R. Evid. 804(b)(2), hearsay evidence is admissible as a dying declaration if the "statement [was] made by a declarant *while believing that the declarant's death* was imminent" and the statement concerned the "cause or circumstances of what the declarant *believed to be impending death.*" (Emphasis added.) The offeror of such a statement must show that

> the declarant was in actual danger of death and had lost all hope of recovery. Because of the dangerous nature of dying declara-

tions, the prerequisites to their admission must be clearly established. The state of mind of the declarant is the key to admissibility and thus, this state of mind must be shown by competent evidence and must not be left to speculation and conjecture. *State v. Lubenow*, 310 N.W.2d 52, 56 (Minn. 1981).

This court has strictly construed the dying declaration hearsay exception. *State v. Bergeron*, 452 N.W.2d 918, 923 (Minn.1990). An example of this strict construction is found in *State v. Bergeron*, in which the declarant asked, " 'I'm dying, aren't I?' " *Id.* The paramedic responded, "Well, you're not doing real good." *Id.* The *Bergeron* court stated that the declarant's statement "I'm dying, aren't I?" alone was arguably insufficient evidence that he believed death was imminent. *Id.* The court went on, however, to infer the declarant's state of mind by examining the circumstances surrounding the statement. The declarant was lying in a pool of blood with eight stab wounds; his lungs and abdominal cavity were filling with blood; his breathing was extremely labored; he was going into severe shock; and he died within two hours of making the statement. *Id.* The court held that the district court made a permissible inference that the declarant thought he was dying at the time he made his statement. *Id.*

Ferguson contends that there is evidence that Allen Jr. did not believe that death was imminent. Jabar testified that he did not think that Allen Jr. was going to die "[b]ecause he was sitting there, and he was talking to me and telling me he was going to fight. He was going to be okay." However, the first police officer to arrive at the scene went to Allen Jr. and asked him how he was doing, to which he responded, "It's not good." The officer asked Allen Jr. who shot him, and he responded, "[I]t was the Bloods."

As in *Bergeron*, Allen Jr.'s statement is probably insufficient in itself to establish that he believed death was imminent. The statement "[i]t's not good" is ambiguous, especially in light of his statement made minutes before that he was going to be okay. Under *Bergeron*, however, this court will look to surrounding ·circumstances to infer that a

declarant ·believed death was imminent. 452 N.W.2d at· 923. Allen Jr. had just been shot in the stomach, he was bleeding profusely, he was fading in and out of consciousness, and he died within hours of making the statement. All of these circumstances together are sufficient to. support an inference that Allen Jr. believed that his death was imminent. We therefore conclude that the district court did not abuse its discretion in concluding that Allen Jr.'s statement "[i]t was the Bloods" was a dying declaration. Because we conclude that Allen Jr.'s statement was a dying declaration, we need not address whether the statement was also an excited utterance.

■ The more difficult question with respect to Allen Jr.'s statement is whether the statement possessed the requisite foundation for admissibility. Minnesota Rule of Evidence 602 states that a witness cannot testify to a matter unless that witness has personal knowledge of that matter. The comments to this rule provide that the declarant of a hearsay statement, like a witness, must have personal knowledge before a statement is admissible under a hearsay exception. Minn. R. Evid. 602 comment. For dying declarations, a "declarant must have had actual observation or opportunity for observation of the fact which he relates." 5 *Wigmore on Evidence* § 1445(2) James H. Chadbourn rev. (1974). The burden of showing that the witness had an adequate opportunity to make such an observation is on the person offering the statement—in this instance, the state. *McCormick on Evidence* § 10 (John William Strong, ed., 4th ed.1992).

■ In ruling on the foundation of Allen Jr.'s statement "[i]t was the Bloods," the district court concluded that the statement was Allen Jr.'s "conclusion based on what happened earlier and it is his opinion which is permissible in this situation." This is clearly the wrong standard. As the United States Supreme Court stated in *Shepard v. United States*, a ·dying declaration is *inadmissible* "if the setting of the occasion satisfies the [court], or in reason ought to satisfy [the court], that the speaker is giving expression to suspicion or conjecture, and not to

known facts." 290 U.S. 96, 101, 54 S.Ct. 22, 78 L.Ed. 196 (1933). In cases where the dying declarant is identifying his killer, courts should apply especially stringent admissibility rules. *See* 41 C.J.S. *Homicide* § 288(b) (1991). If the declarant's identification is simply a result of reasoning from collateral facts, the statement should not be admitted. *Id.* Here, the district court stated that Allen Jr.'s statement was a conclusion based on earlier events. Moreover, both at the pretrial hearing and in its closing argument, the state admitted that Allen Jr. did not see his shooter. Because Allen Jr. had no personal knowledge and did not see his shooter at the time of the shooting, we conclude that his statement "[i]t was the Bloods" was mere speculation that lacked foundation. Therefore, the district court abused its discretion when it admitted this statement.

■ Even though Allen Jr.'s statement was improperly admitted, Ferguson is not entitled to a new trial if this error was harmless beyond a reasonable doubt. *State v. Juarez*, 572 N.W.2d 286, 292 (Minn.1997). In applying harmless error impact analysis, we ask, "What effect did the jury's hearing [the improperly admitted evidence] actually have on the guilty verdict rendered" and whether the verdict was "surely unattributable" to the error. *Id.* In applying this test, we look to the manner in which the improperly admitted evidence—the dying declaration—was presented, whether it was highly persuasive, whether it was used in closing argument, and whether the defense effectively countered it. *See Maurer v. Department of Corrections,* 32 F.3d 1286, 1289 (8th Cir.1994).

When the dying declaration was introduced through the police officer's testimony, the officer admitted that Allen Jr. may have just been guessing when he stated that "[i]t was the Bloods." Moreover, the state did not argue to the jury that Allen Jr. actually saw his shooter. During its closing argument, the state admitted that "[n]obody saw Alonzo Ferguson pull the trigger here." The defense as well argued in its closing statement that "Allen Wheatley, Jr., could not see who shot him. He has no idea who shot him. When he said '[i]t was the Bloods,' we don't know if he's right or wrong." Furthermore,

although the district court did not directly instruct the jury on the use of Allen Jr.'s statement, it did give a general instruction on the use of witness identifications:

Testimony has been introduced in this case tending to identify [Ferguson] as the person observed at the time of the alleged offense. You should carefully evaluate this testimony.

In doing so, you should consider such factors as the opportunity of the witness to see the person at the time of the alleged offense, the length of the time the person was in the witness's view, the circumstances of that view including light conditions and the distance involved, the stress the witness was under at the time, the lapse of time between the alleged offense and the identification.

We assume that the jury follows a court's instructions. *See State v. Forcier,* 420 N.W.2d 884, 885 n. 1 (Minn.1988). Therefore, we assume that the jury applied the court's instruction to Allen Jr.'s statement. Although the statement was inadmissible speculation, the jury had the information necessary to determine that Allen Jr.'s statement was nothing more than speculation. Given the court's limiting instruction and the state's admission that Allen Jr. did not see his shooter, we conclude that the verdict against Ferguson was "surely unattributable" to the error of admitting Allen Jr.'s statement "[i]t was the Bloods." *See Juarez,* 572 N.W.2d at 292.

*b. Gang graffiti photographs and Sgt. Jackson's explanation of the graffiti.*

Ferguson contends that photographs of a dresser covered with gang graffiti and Sgt. Jackson's explanation of that graffiti were improperly admitted into evidence because it was extrinsic evidence of a collateral matter, improper character evidence, and overly prejudicial. Ferguson's first contention is that the state admitted this evidence for impeachment purposes, and he correctly points out that extrinsic evidence of collateral matters cannot be used to impeach a witness. Admittedly, when the state first proposed introducing this evidence, it did so under the guise of impeaching Ferguson's and his

mother's testimony that Ferguson was not a gang member.

■ If this evidence were offered only for impeachment purposes, its admissibility depends on whether the evidence relates to a collateral matter. Under Minn. R. Evid. 608(b), specific instances of conduct to attack a witness's credibility cannot be proved by extrinsic evidence. "The rule of law is well established that an examining attorney who inquires into collateral matters on cross-examination, including those matters relating to the witness' credibility, is bound by the answers he receives. The cross-examiner is not permitted [to introduce] collateral matters to prove facts contradicting the answers, even if they are false." *State v. Sharich*, 297 Minn. 19, 24, 209 N.W.2d 907, 911 (1973). Therefore, if the gang graffiti is only a collateral issue, the extrinsic evidence of the photographs and the police testimony about the graffiti should not have been admitted for impeachment purposes. Thus, we must address whether evidence of Ferguson's gang affiliation is only a collateral issue.

■ Evidence of other crimes, wrongs, or acts is inadmissible to prove that the perpetrator of these other acts acted in conformity with an alleged character trait. Minn. R. Evid. 404(b). Such evidence, however, is admissible for other purposes, such as evidence of motive. *Id.* After the gang graffiti evidence was admitted, the defense moved for a mistrial. At that point, the state replied that the evidence was admissible because it tended to prove Ferguson's motive. The state's theory of the case was that the murder was gang-related, and that Ferguson and Allen Jr. belonged to rival gangs. As such, Ferguson's gang affiliation was essential to the state's proof of motive. The admission of the graffiti evidence did not violate rule 608 because gang affiliation was not a collateral issue. Nor did its admission violate rule 404(b) because the evidence tended to prove motive.

■ Ferguson's final argument regarding the gang graffiti is that its admission violated Minn. R. Evid. 403 because the possibility of its prejudice outweighed its probative value. His argument focuses especially on Sgt. Jackson's testimony about the meaning of the graffiti, which he characterizes as "highly inflammatory." Under Minn. R. Evid. 403, evidence should be excluded if the danger of unfair prejudice substantially outweighs its probative value. This court has explained that "in Rule 403, 'prejudice' does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." *State v. Cermak*, 365 N.W.2d 243, 247 n. 2 (Minn.1985) (quoting 22 C. Wright & K. Graham, Federal Practice and Procedure–Evidence § 5215 (1978)).

■ Evidence does not violate rule 403 merely because it is highly damaging to the other side's case. To the contrary, such evidence is admissible when it is highly probative. *See, e.g., Cermak*, 365 N.W.2d at 246–47 (affirming the admission of photographs of the sexual abuse of children when the pictures strengthened the state's case against the defendant). For instance, in *State v. Naylor*, the state alleged that the murder was related to the defendant's involvement in witchcraft. 474 N.W.2d 314, 317 (Minn.1991). The district court admitted testimony about the defendant's involvement with witchcraft, photographs of books on witchcraft in the co-defendant's house, and the actual books on witchcraft to which the defendant had access. *Id.* This court affirmed the admission of almost all of these evidentiary items, concluding that any unfair prejudice was substantially outweighed by the evidence's probative value because it tended to prove his research into and planning of the murder. *Id.* at 318–19.[1]

Ferguson's case is similar to *Naylor*. While the photographs of the gang graffiti and the testimony explaining the graffiti may

---

1. We concluded, however, that it was error for one of the books to be admitted. *Naylor*, 474 N.W.2d at 319. This book, *Satanism: Is Your Family Safe?*, contained a specific directive to jury members not to shy away from convicting witches and satan worshippers. *Id.* Admission of this book was overly prejudicial. *Id.* Nevertheless, we held that the error of its admission was harmless. *Id.* at 320.

have been highly prejudicial, the evidence was also highly probative of Ferguson's alleged motive to kill Allen Jr. Further, the district court explicitly instructed the jury that Ferguson was "not on trial for being or not being a member of a gang or for associating or not associating with persons who may be gang members." We conclude that the court did not abuse its discretion in admitting the gang graffiti evidence.

### c. *Vouching testimony.*

■ Ferguson argues that the district court improperly allowed several state witnesses to vouch for the credibility of other witnesses. He argues that it was improper to allow the reading of the transcript of Sgt. Jackson's questioning of Ferguson in which Jackson accused Ferguson of lying; to allow the state to read portions of the plea agreement with the informant, Johnny Edwards, during Edwards' redirect examination; and to introduce Jackson's testimony that Edwards had provided statements in other cases. The state counters that the court instructed the jury that it was not to use as evidence the questions asked by Jackson and read to the jury and that Ferguson did not object to the reading of Edwards' plea agreement at trial. Finally, the state contends that Jackson only testified about routine police procedure and did not vouch for Edwards.

■ "[T]he credibility of a witness is for the jury to decide." *State v. Koskela,* 536 N.W.2d 625, 630 (Minn.1995). Therefore, one witness cannot vouch for or against the credibility of another witness. *Id.* For example, in *State v. Koskela,* we stated that it was troubling for a police officer to state "I had no doubt whatsoever that I was taking a truthful statement." *Id.; see also State v. Ellert,* 301 N.W.2d 320, 323 (Minn.1981) (holding that it was error to admit police testimony that defendant was lying when she made her statement to the police).

If Sgt. Jackson had testified that Ferguson was lying and the Wheatley family members were testifying truthfully, such evidence would be inadmissible. But that is not what happened. Before Jackson testified, the district court explained that the transcript of the statement Ferguson gave two days after the murder was going to be read. The state would read the questions asked by Jackson to give context to the answers Ferguson gave and Jackson would read Ferguson's answers. The court instructed the jury that Jackson's questions were not evidence, and the jury should not consider them in reaching its verdict. Only Ferguson's answers constituted evidence. Jackson's questions, in contrast, were not admitted into evidence at all because the court gave the jury the instruction to disregard Jackson's questions.

The crucial question is whether the jury instruction was adequate. Courts presume that juries follow the instructions they are given. See *Forcier,* 420 N.W.2d at 885 n. 1. However, when "the impact of the prejudicial remark may be such as to impart to the minds of the jury substantial prejudicial evidence not properly a part of the case, it is taking too much for granted to say its effect can be removed by an instruction from the court." *State v. Huffstutler,* 269 Minn. 153, 156, 130 N.W.2d 347, 349 (1964) (quoting *State v. Reardon,* 245 Minn. 509, 513, 73 N.W.2d 192, 194 (1955)). In analyzing constitutional issues, the United States Supreme Court has listed three relevant factors to consider when determining if a jury instruction is adequate: the likelihood that the jury will disregard the instruction, the probability that the jury's disregard will have a "devastating effect" on the case, and the determinability of the facts before trial. *Cruz v. New York,* 481 U.S. 186, 193, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987).

Applying these three factors here convinces us that the jury instruction was adequate. It is unlikely that the jury disregarded the district court's instruction. The court gave the limiting instruction before the transcript was read. As such, the jury listened to the testimony knowing that it should heed only Ferguson's answers as read by Sgt. Jackson. Further, given the context of the questioning, it is unlikely that this testimony had a devastating effect on the verdict. The jury was made aware of the context of the questioning. It knew that Ferguson was at the police station when the questioning occurred and could infer that Jackson was at-

tempting to get as much information from Ferguson as possible. As such, the jury could have understood Jackson's statements about the credibility of Ferguson and other witnesses as a mere attempt to get Ferguson to confess.

■ Ferguson also contests the admissibility of the statements involving Johnny Edwards' plea agreement. Ferguson did not object to this testimony at trial. Generally, the failure to object at trial constitutes a waiver of the right to have the court consider that issue on appeal. *Van Buren v. State*, 556 N.W.2d 548, 551 (Minn.1996). However, this court "will consider plain error affecting substantial rights if the error had the effect of denying the defendant a fair trial." *Id.*; *see also* Minn. R. Evid. 103(d); Minn. R.Crim. P. 31.02. An error is plain error if there is a "reasonable likelihood that [it] substantially affected the verdict." *State v. Glidden*, 455 N.W.2d 744, 747 (Minn.1990).

On redirect examination, the state read the plea agreement it had made with Edwards, which stated that Edwards would give complete, honest, and accurate information. Because Edwards was on the witness stand, the jury had the opportunity to assess his credibility and, as such, it is unlikely that the reading of the plea agreement substantially affected the verdict. Therefore, the admission of the plea agreement was not plain error, and since the defense made no objection at trial, we will not consider this issue on appeal.

■ Finally, Ferguson contends that the court improperly allowed Sgt. Jackson to testify that Edwards also gave the police information in five or six other crimes. Ferguson claims that by doing so, Jackson was vouching for Edwards' credibility. As the state points out, Jackson did not testify that Edwards was telling the truth or that he believed one witness over another. We conclude that this was not vouching testimony.

## II.

■ Ferguson also contends that the evidence presented at trial was insufficient to support a guilty verdict. When reviewing a jury verdict, we view the evidence and any reasonable inferences to be drawn from that evidence in the light most favorable to the verdict. *State v. Buchanan*, 431 N.W.2d 542, 547 (Minn.1988). We ask "whether the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that defendant was proven guilty of the crime charged." *State v. Clark*, 296 N.W.2d at 371. In this context, we assume that the jury believed the state's witnesses and disbelieved any evidence to the contrary. *Buchanan*, 431 N.W.2d at 547. Convictions based on circumstantial evidence alone may be upheld, because circumstantial evidence is entitled to as much weight as any other evidence. *State v. Ostrem*, 535 N.W.2d 916, 923 (Minn.1995). Nevertheless, "[c]onvictions based on circumstantial evidence warrant particular scrutiny." *State v. Scharmer*, 501 N.W.2d 620, 621 (Minn.1993).

Viewing the evidence in the light most favorable to the verdict, we conclude that sufficient evidence did point to Ferguson as being the murderer. The state presented undisputed testimony that 20 to 30 minutes before the shooting there was a confrontation between Ferguson and Allen Jr. Vincent Wheatley testified that he saw Ferguson on the side of the house minutes before gunfire erupted. Edwards testified that on the morning of the shooting, Ferguson had a gun and told him he was going to kill Prentice Wheatley's cousin. Later in the day, Ferguson told Edwards that he had seen the victim's shadow in the window and he shot him.

The defense points out that some of the evidence was conflicting. Nevertheless, the standard for overturning a jury verdict is high. "Inconsistencies in the state's case or possibilities of innocence do not require reversal of a jury verdict so long as the evidence taken as a whole makes such theories seem unreasonable." *Ostrem*, 535 N.W.2d at 923. Further, the district court instructed the jury that it could find Ferguson guilty of a crime committed by another if Ferguson "had either a high level of activity in the crime or played at least some knowing role in its commission and took no steps to thwart its completion." Given the high standard

that a defendant must meet on appeal to overturn a jury verdict, we conclude that there is more than sufficient evidence to support the jury's finding that Ferguson is guilty of the murder of Allen Wheatley Jr.

Affirmed.

PAGE, Justice (dissenting).

I respectfully dissent. I agree with the court that the victim's statement "[i]t was the Bloods" does not possess the requisite foundation for admissibility and, therefore, its admission was error. It is clear, from the record presented, that there is no evidence to support the trial court's conclusion that the victim in this case had any personal knowledge as to who shot him. I disagree, however, with the court's conclusion that the trial court's error was harmless.

Most of the evidence implicating Alonzo Ferguson in Allen Wheatley, Jr.'s death was circumstantial and, at best, weak. Although circumstantial evidence is sufficient to convict a criminal defendant,[1] the issue here is not whether the evidence against Ferguson is sufficient to sustain his conviction, but whether his conviction was "surely unattributable" to the trial court's error[2] in admitting the victim's highly prejudicial statement, "[i]t was the Bloods."

The most damaging evidence against Ferguson came in testimony from Johnny Edwards, a police informant, who, more than 12 months after Allen Wheatley, Jr. was shot, offered to testify against Ferguson as part of a plea agreement related to crimes Edwards was charged with, but which had nothing to do with this case. Edwards testified that he saw Ferguson and another Bloods member prior to the murder, in the early morning on September 24, just as the sun was beginning to rise, and that Ferguson told him that he had an argument with Allen Wheatley, Jr. and planned to kill him. Edwards further testified that Ferguson was armed with a .45 caliber automatic weapon and that his companion had a .25. Finally, he testified that, later that same day, Ferguson admitted to him that he had shot Allen Wheatley, Jr.

The problem with Edwards' testimony, beyond the obvious concerns about his motive, credibility, and veracity, is that it is uncorroborated and inconsistent with certain established facts. As such, serious questions arise as to his version of events. Allen Wheatley, Jr. was shot around 5:00 a.m., yet Edwards claims that it was just before sunrise (which occurred at about 7:02 a.m. on September 24, some two hours after the actual shooting) when Ferguson told him that he planned to do the shooting. Further, the weapons Edwards claims that Ferguson and his companion were carrying—.45 and .25 caliber handguns—could not have been involved in the shooting inasmuch as the bullet recovered from Allen Wheatley, Jr.'s body came from either a .380 or a 9–millimeter gun.

The only other evidence directly implicating Ferguson was the testimony of Vincent Wheatley, who testified that he saw Ferguson, wearing a maroon or black-red flannel shirt, accompanied by an unknown individual at the side of the house just before the shooting. From this, and other evidence, the state theorized that Ferguson was the shooter. Yet, the inference to be drawn from this testimony is weakened by the fact that others testified that Ferguson was wearing a brown jacket when seen earlier in the evening and by the fact that when the police searched Ferguson's house a few days after the shooting, they recovered a brown jacket, but no maroon or black-red flannel shirt was found.

Further, the inferences to be drawn from the remainder of the evidence against Ferguson, viewed in the light most favorable to the jury's verdict, do not lead unerringly to Ferguson's guilt. At most, the evidence demonstrates that Ferguson was in a heated argument with Allen Wheatley, Jr. earlier in the morning over the "colors" he was wearing. However, from the record, it appears that that argument was no more heated than the one Allen Wheatley, Jr. had with his cousin, Prentice Wheatley, which flowed out of the

---

**1.** *State v. Bias,* 419 N.W.2d 480, 484 (Minn. 1988).

**2.** *Juarez,* 572 N.W.2d 286, 292 (Minn.1997) (citations omitted).

argument with Ferguson.[3] The state also places great importance on Ferguson's involvement as a gang member. But the mere fact that Ferguson may have been a gang member does not, without more, lead to the conclusion that Ferguson committed the shooting. While inferences from the fact that Ferguson was a gang member may in some limited way support the state's theory of the case, which was that Ferguson shot Allen Wheatley, Jr. because he was a member of a rival gang, the inferences from that fact do not have much value without Allen Wheatley, Jr.'s statement, "[i]t was the Bloods."

Because the evidence against Ferguson was weak and because the statement "[i]t was the Bloods" was highly prejudicial, the trial court's erroneous admission of the statement was not harmless beyond a reasonable doubt. Simply put, it cannot be said with any certainty that Ferguson's conviction was "surely unattributable" to the trial court's error.

Therefore, I dissent.

GARDEBRING, Justice (dissenting).

I join in the dissent of Justice PAGE.

---

**3.** It should be noted that Prentice Wheatley's whereabouts were unaccounted for at the time of     the shooting.