IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 35578-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TROY LEE STEENHARD also known as | ) | UNPUBLISHED OPINION |
| TROY LEE BLOOR, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Troy Steenhard appeals convictions for child rape and child molestation primarily on the grounds that insufficient evidence supported the conviction of rape and vouching for child witnesses and a noncorroboration jury instruction tainted the convictions for molestation. We agree and reverse all three convictions. We dismiss the charge of first degree rape of a child and remand for a new trial on the charges of first degree child molestation.

FACTS

This prosecution arises from the alleged sexual abuse of twin sisters, Linda and Marlene, born in 2011 to Molly Tresh. All three names are pseudonyms. Tresh worked

fulltime, so Tresh's mother cared for the twins after preschool. On April 10, 2016, Tresh's mother died, and Tresh needed a new afternoon caretaker for the twins. After consulting with her boyfriend, David Holm, Tresh arranged for Troy Steenhard to babysit Marlene and Linda through the rest of the school year.

Neighborhood children, including David Holm's ten-year-old daughter, clustered at Troy Steenhard's home. Steenhard requested that all children call him "Uncle Troy." Report of Proceedings (RP) at 416-17. Molly Tresh viewed Steenhard's interaction with Linda and Marlene and had no concerns about leaving her daughters in his care. Tresh paid Steenhard $100 per week to watch Linda and Marlene from 11:30 a.m. until David Holm returned home from work at 4:00 p.m. each school day. Steenhard also oversaw Holm's daughter when she came home from school at 3:15 p.m.

Initially, Troy Steenhard watched Linda and Marlene at Molly Tresh's home. One week into the arrangement, Steenhard experienced car trouble and asked Tresh if he could babysit the twins at his home. Tresh agreed.

Troy Steenhard lived with his 18-year-old nephew Vinny Embler and his pregnant daughter, Whitney. The daughter lacked work. Steenhard testified at trial that Whitney, Vinny, Vinny's girlfriend, Shannon Williams, or Steenhard's friend, Anita Brandon, were present in his house while he babysat Linda and Marlene. According to Steenhard, visitors entered the home without knocking. Molly Tresh testified that Steenhard was

2

often the only adult present when she retrieved the twins, although other children were present.

Two weeks after Troy Steenhard began overseeing Linda and Marlene, Molly Tresh noticed her daughters clinging to her. The twins cried, begged her not to go to work, and asked not to go to Steenhard's house after school. Tresh believed the twins' abnormal behavior resulted from their grandmother's recent death. Linda and Marlene continued this behavior throughout Steenhard's tenure as babysitter, which lasted one month. The twins did not then complain about Steenhard. Tresh and Steenhard disagreed as to the reason for terminating Steenhard's services.

In June 2016, Linda and Marlene's behavior normalized. During the summer break, David Holm's other 13-year-old daughter babysat the twins. Holm's daughter soon notified Molly Tresh that Linda and Marlene played with Barbie dolls as if the dolls engaged in sex. Tresh first believed the twins' single father influenced the girls with his many female friends visiting his house.

In December 2016, Molly Tresh retrieved Marlene early from school because of Marlene's temporary illness. While Molly Tresh and Marlene rode alone in a car, Marlene spontaneously told her mother that she did not wish to go skating with Troy Steenhard. Marlene added that Steenhard was "'a bad man.'" Report of Proceedings (RP) at 435. When the mother asked Marlene what she meant, Marlene replied: "'[h]e touches me in my privates.'" RP at 435. Tresh asked her daughter to

3

describe the behavior. Marlene placed her hand under her dress, pulled her dress up, wiggled her hand, and displayed an in-and-out motion with her hand near her vagina. When Marlene and Tresh arrived home, Marlene repeated her statements to David Holm and to Tresh's friend, Leah Bias. On Bias' advice, Tresh called the sheriff's office and spoke with a detective.

Later during the day of Marlene's disclosure, Molly Tresh and Marlene attended a doctor's appointment previously scheduled for Marlene because of her illness. After several questions by the doctor, Marlene stated that Troy Steenhard had touched her. The doctor did not perform any gynecological examination.

On December 31, 2016, Linda and Molly Tresh drove near Troy Steenhard's home while visiting Tresh's ex-husband at a grocery store. Linda grew teary-eyed and remarked: "'you're not taking us to Troy's.'" RP at 461-62. When Tresh said no, Linda exclaimed: "'Troy is a bad man. He touched our privates.'" RP at 462. After the return home, Linda disclosed that Steenhard touched her privates on his couch. Linda refused to speak further on the subject. We do not know if Linda had earlier learned of Marlene's accusations against Troy Steenhard.

At some unidentified time and place, Leah Bias spoke with Marlene. Bias held a Barbie doll and asked Marlene to show her the "bad places" where Troy Steenhard touched her. RP at 536. Marlene pointed to a part of the doll between the lower chest and upper thighs, which included the vaginal area. When Bias turned the doll around and

asked Marlene whether Steenhard touched her on the buttocks, Marlene said no.

On January 3, 2017, child forensic interview specialist Tatiana Williams, of Partners with Families & Children, separately interviewed the twins. During trial, the State played for the jury a video disk of each interview. In the interviews, both Linda and Marlene mixed fantastical stories with descriptions of molestation by Troy Steenhard.

During her interview, Marlene commented that Troy Steenhard made her touch his penis all day long. According to Marlene, she tickled and squeezed Steenhard's privates after he showed her how. Steenhard required Marlene to touch his penis while he urinated. Marlene added that, on numerous occasions, Steenhard touched her privates with his hand, did not stop when she requested, and told her not to tell or he would ground her. Marlene described an incident when her vaginal area bled due to Steenhard's sharp nails.

During the January 3 interview, Marlene stated that Troy Steenhard urinated onto her mouth on more than one occasion. She vomited each time. Marlene described an incident when Steenhard put a bunny into her vagina. She told the interviewer that the bunny was real. Marlene elaborated that Steenhard inserted the smooth bunny into her privates with a knife handle. According to Marlene, she took a picture of the bunny inside her privates with Steenhard's phone, but Marlene's mother deleted the photograph from the phone. Marlene also stated that Troy Steenhard pulled her pants off while ice

skating and the whole town saw the incident. Marlene added that one day she bled all day and her blood went from red to pink to purple to rainbow.

During her interview by Tatiana Williams, Linda only mentioned Troy Steenhard toward the end of the interview. She denied that Steenhard served as her babysitter. Linda asserted that Steenhard touched her and Marlene on their respective vaginas at his house with his bare hand. She added that her mother then slapped Steenhard. Like Marlene, Linda knew that a private part is used for going to the bathroom.

After the interview, Marlene occasionally related more details. She described being forced into Troy Steenhard's bedroom and Steenhard taping her hands and feet. She stated that she did not tell anyone about Steenhard's behavior sooner because Steenhard threatened to hurt her family and predicted he would go to jail. Marlene told law enforcement about Steenhard's sharp finger nails, which description matched photographs of Steenhard's hands taken by law enforcement.

On January 11, 2017, the twins underwent separate physical examinations at Partners with Families & Children. A forensic nurse conducted a genital exam on both Marlene and Linda and found no aberrations. During each physical examination, Marlene and Linda respectively disclosed inappropriate touching by Troy Steenhard.

PROCEDURE

The State of Washington charged Troy Steenhard with one count of raping Marlene, a child, in the first degree. The State also charged Steenhard with two counts of

6

child molestation in the first degree, one count with Marlene as victim and one count with Linda as victim.

The trial court conducted a child hearsay hearing under RCW 9A.44.120(1) in order to assess whether to show, during trial, the recorded interviews of Linda and Marlene to the forensic interviewer and whether to admit comments uttered to their mother Molly Tresh and statements made to Leah Bias. The trial court ruled all interviews and statements to be admissible under the factors enumerated in *State v. Ryan*, 103 Wn.2d 165, 691 P.2d 165 (1984).

Marlene testified at trial. The trial court ruled Linda incompetent to testify at trial.

The prosecution began the examination of Marlene as follows:

Q. [DEPUTY PROSECUTOR]: Does your mom have rules about telling the truth?
A. [MARLENE]: She says to always don't lie and always tell the truth.
Q. [DEPUTY PROSECUTOR]: What happens if you don't tell the truth in your home?
A. [MARLENE]: You get in big trouble.
. . . .
Q. [DEPUTY PROSECUTOR]: Whenever you talked about Troy, did you tell the truth?
A. [MARLENE]: Yes.
Q. [DEPUTY PROSECUTOR]: Did your mom tell you anything about telling the truth today in court in front of these people?
A. [MARLENE]: No.
Q. [DEPUTY PROSECUTOR]: Did the judge tell you anything?
A. [MARLENE]: Yes.
Q. [DEPUTY PROSECUTOR]: Did he tell you to tell the truth?
A. [MARLENE]: Yeah.

> Q. [DEPUTY PROSECUTOR]: If I told you right now that I was
> wearing a purple hat on my head, would that be a true thing or not a true
> thing?
> A. [MARLENE]: Not a true thing.
> Q. [DEPUTY PROSECUTOR]: If I told you right now that you
> were wearing a blue dress, would that be a true thing or not a true thing?
> A. [MARLENE]: A true thing.

RP at 525-27.

At trial, Marlene identified Troy Steenhard as her former babysitter and testified that she did not like his touching her privates with his hand. She identified the locus of the touching as being Steenhard's bedroom.

During trial, the prosecutor asked the twins' mother, Molly Tresh, about her discussion with Linda and Marlene prior to the forensic interview. The following exchange then occurred without objection:

> Q. [DEPUTY PROSECUTOR]: And why did you choose not to talk
> to the girls about what had happened between when you learned about it
> and the forensic interview?
> A. [TRESH]: Because I knew—the detective had explained to me
> what a forensic interview was, and I didn't want to cloud—cloud Marlene's
> mind, because at the time, it was just Marlene that we had at the
> appointment for. I didn't want any adult verbiage. I didn't want her to be
> influenced by my feelings. I wanted them to be able to tell what was
> actually on their mind and what truly happened without any influence from
> anybody.
> . . . .
> Q. [DEPUTY PROSECUTOR]: Did you have some kind of—any
> concerns about the possibility of making a false accusation against Mr.
> Steenhard?
> A. [TRESH]: No, no. I knew that my children—I mean, if given the
> opportunity, they're going to tell the truth. They're not going to lie. They

don't even understand what they're even saying in regards to any type of that.

RP at 466-67.

The prosecution asked Leah Bias similar questions. The following exchange occurred without objection:

> Q. [DEPUTY PROSECUTOR]: In terms of their honesty, have you had a chance to observe that in the girls?
> A. [BIAS]: Yeah.
> Q. [DEPUTY PROSECUTOR]: Let's start with Marlene. Is Marlene an honest girl?
> A. [BIAS]: Yes, she is.
> Q. [DEPUTY PROSECUTOR]: Are you aware whether they have any rules in the house or does she ever talk to you about rules regarding telling the truth?
> A. [BIAS]: Basic rules, just like any kid. You need to tell me the truth. Our children play together so that's—you know, we have the same values in that.
> Q. [DEPUTY PROSECUTOR]: What about Linda?
> [A. BIAS]: The same.

RP at 538-39. Leah Bias testified at trial as to Marlene identifying on a Barbie doll the bodily parts at which Troy Steenhard touched her.

Tatiana Williams, the child interviewer, testified that a child age five and under often incorporates some fantasy when describing historical events in his or her life. Forensic nurse Teresa Forshag of Partners with Families & Children testified that more than ninety percent of the time a female child suffering from sexual abuse shows no physical evidence in the vagina since actual penetration may not leave marks. Troy Steenhard testified at trial and denied ever touching the twins inappropriately.

9

The trial court gave the standard first instruction to the jury at the close of the case. One paragraph of the instruction read:

> You are the sole judges of the credibility of each witness. You are also the sole judges of the value or weight to be given to the testimony of each witness. In considering a witness's testimony, you may consider these things: the opportunity of the witness to observe or know the things he or she testifies about; the ability of the witness to observe accurately; the quality of a witness's memory while testifying; the manner of the witness while testifying; any personal interest that the witness might have in the outcome or the issues; any bias or prejudice that the witness may have shown; the reasonableness of the witness's statements in the context of all of the other evidence; and any other factors that affect your evaluation or belief of a witness or your evaluation of his or her testimony.

Clerk's Papers (CP) at 11. The trial court instructed the jury regarding the elements of rape of a child in the first degree as charged in count 1. Jury instruction no. 7 reads, in pertinent part:

> To convict the defendant of the crime of RAPE OF A CHILD IN THE FIRST DEGREE as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That between about April 1, 2016 and May 31, 2016, the defendant had *sexual intercourse* with [Marlene];
> (2) That [Marlene] was less than twelve years old at the time of the sexual intercourse and was not married to the defendant;
> (3) That [Marlene] was at least twenty-four months younger than the defendant; and
> (4) That this act occurred in the State of Washington.

CP at 18 (emphasis added). Instruction no. 8 read:

> Sexual intercourse means any act of sexual contact between persons involving the sex organs of one person and the mouth or anus of another.

CP at 19. Neither party objected to either instruction.

Jury instruction no. 14 declared:

> In order to convict a person of the crime of RAPE OF A CHILD IN THE FIRST DEGREE or CHILD MOLESTATION IN THE FIRST DEGREE, it shall not be necessary that the testimony of the alleged victims be corroborated.

CP at 25. Troy Steenhard objected that the instruction partially relieved the State of its burden of proof.

During deliberations, the jury submitted the trial court an inquiry requesting clarification on the definition of sexual intercourse:

> The jury requests additional clarification on 'sexual intercourse' as defined by WA law. The definition presented does not seem to apply to any testimony presented during trial.

CP at 33. After consultation with counsel, the court decided not to supplement the definitional instruction. The judge instructed the jury to rely on the instructions already provided.

The jury convicted Troy Steenhard on all three charged counts. Steenhard moved for judgment notwithstanding the verdict or for a new trial on count 1, rape of a child in the first degree. He argued insufficient evidence supported a conviction. The trial court denied the motion while concluding that a reasonable jury could have found all elements of the charge beyond a reasonable doubt.

## LAW AND ANALYSIS

Troy Steenhard asks that we reverse his conviction for first degree rape of Marlene

and dismiss the charges because of insufficient evidence. He also asks that we reverse all three convictions because of instructional error and vouching of the twin sisters. We grant all requests. We first address the conviction for rape.

Sufficiency of Evidence for First Degree Rape of a Child

Troy Steenhard contends insufficient evidence supports his conviction for rape of a child in the first degree because the State failed to prove the element of sexual intercourse as required by a jury instruction. According to Steenhard, under the law stated in jury instruction 8, the jury could not convict him of rape of a child without finding oral or anal contact with sexual organs. He highlights that, under Marlene's testimony, he never placed his penis against Marlene's mouth or anus and he never touched Marlene's vagina with his mouth. The State responds that the jury could employ a definition of "sexual intercourse" other than given in instruction no. 8 and could have applied the term's ordinary meaning. The State asserts that a rational trier of fact could have found sexual intercourse as a result of Steenhard inserting his fingers or the ersatz bunny into Marlene's vagina. We agree with Steenhard.

To convict Troy Steenhard, the jury had to find that he engaged in "sexual intercourse with another who is less than twelve years old and not married to [him] and [he] is at least twenty-four months older than the victim." RCW 9A.44.073(1). RCW 9A.44.010 defines sexual intercourse, in pertinent part:

12

(1) "Sexual intercourse" (a) has its ordinary meaning and occurs upon any penetration, however slight, and

(b) Also means any penetration of the vagina or anus however slight, by an object, when committed on one person by another, whether such persons are of the same or opposite sex, except when such penetration is accomplished for medically recognized treatment or diagnostic purposes, and

(c) Also means any act of sexual contact between persons involving the sex organs of one person and the mouth or anus of another whether such persons are of the same or opposite sex.

Jury instruction 8 did not follow the definition of "sexual intercourse" implanted in RCW 9A.44.010(1). Rather than including the entire definition of sexual intercourse under the statute, the trial court's instruction read that "sexual intercourse" means any act of sexual contact between persons involving the sex organs of one person and the mouth or anus of another. The State did not submit an instruction that included subsection (1)(a) or (1)(b) of RCW 9A.44.010 or propose 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTION: CRIMINAL 45.01, at 915 (4th ed. 2016).

The State urges this court to hold that the jury was not limited to the definition of sexual intercourse as given in instruction no. 8 when assessing whether Troy Steenhard committed rape of a child. We agree with the State that, assuming the jury could employ the general definition of intercourse, the jury could rationally have found Troy Steenhard guilty. Nevertheless, we conclude we must assess the evidence in light of jury instruction 8.

The law of the case doctrine provides that jury instructions not objected to become

13

the law of the case. *State v. Johnson*, 188 Wn.2d 742, 762, 399 P.3d 507 (2017); *State v. Willis*, 153 Wn.2d 366, 374, 103 P.3d 1213 (2005); *State v. Jussila*, 197 Wn. App. 908, 930, 392 P.3d 1108 (2017), *review denied*, 191 Wn.2d 1019, 428 P.3d 1188 (2018). In criminal cases, the State assumes the burden of proving otherwise unnecessary elements of the offense when a jury instruction includes such elements without objection. *State v. Hickman*, 135 Wn.2d 97, 102, 954 P.2d 900 (1998). The trial court rendered instructions no. 7 and 8 without objection. Thus, we conclude that the two instructions became the law of the case.

The State argues that definitional instructions do not become the law of the case. In support of this contention, the State cites decisions that hold definitional statutes do not create additional alternative means to committing an offense. We do not consider such decisions helpful. *State v. Johnson*, 188 Wn.2d 742 (2017) and *State v. Hickman*, 135 Wn.2d 97 (1998) demand that the State prove the crime as stated in the jury instructions. The rationale behind this demand extends to definitions of terms delineating the crime. The State forwards no decision rejecting the application of the law of the case doctrine to definitional instructions.

The State also maintains that, in essence, Troy Steenhard contends that the trial court committed instructional error when delivering jury instruction 8 because the instruction failed to properly define "sexual intercourse." The State further argues that, since Steenhard did not object to the instruction at trial, he cannot claim error on appeal.

14

Nevertheless, the State cites no decision that holds an accused must object to an instruction that imposes a higher burden on the State beyond a statute's description of the crime. We know of no purpose behind an accused objecting to a favorable, but erroneous, instruction, and we surmise that defense counsel would have engaged in ineffective assistance of counsel if counsel interposed an objection. If the State's contention was correct, the Washington courts would have erroneously decided *State v. Johnson*, 188 Wn.2d 742 (2017), *State v. Willis*, 153 Wn.2d 366 (2005), *State v. Hickman*, 135 Wn.2d 97 (1998), and *State v. Jussila*, 197 Wn. App. 908 (2017), because in each case the accused failed to object to a jury instruction that increased the State's burden of proof.

A criminal defendant may always challenge the sufficiency of the evidence supporting a conviction for the first time on appeal. RAP 2.5(a); *State v. Hickman*, 135 Wn.2d at 103 n.3 (1998). When evaluating the sufficiency of evidence to convict, this court must draw all reasonable inferences from the evidence in favor of the State. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

The only evidence of possible contact between Troy Steenhard's penis and Marlene's mouth or anus is her statement that he peed on her mouth. Nevertheless, Marlene never declared that the penis touched her mouth, let alone entered her mouth. In statements to Leah Bias, Marlene denied ever being touched in the buttocks area and failed to describe any oral contact. The State does not contend that, assuming we adjudge

15

the sufficiency of the evidence based on jury instruction 8, sufficient evidence supports the conviction.

During deliberations, the jury told the trial court that the instruction defining "sexual intercourse" did not fit any testimony presented during trial. The jury's question bolsters our conclusion.

If the reviewing court finds insufficient evidence to prove a crime's element added by jury instruction, reversal is required. *State v. Jussila*, 197 Wn. App. at 932 (2017). Retrial following reversal for insufficient evidence is unequivocally prohibited and dismissal is the remedy. *State v. Hickman*, 135 Wn.2d at 103 (1998). Therefore, we remand to the trial court for dismissal of the charge against Troy Steenhard of child rape in the first degree.

Noncorroboration Jury Instruction

We must still consider whether to grant Troy Steenhard a new trial on the two remaining convictions of child molestation in the first degree. Steenhard seeks a new trial on various grounds, including jury instruction 14 that told the jury that no witness needed to corroborate either Marlene's or Linda's testimony in order to convict Steenhard of the respective charges. Based on precedent, we find no error in the trial court's delivery of the jury instruction, but we later hold that, when viewing the instruction in light of other witnesses' vouching for the victims, the instruction contributed to error prejudicing Troy Steenhard.

Jury instruction 14 informed the jury that, to convict Troy Steenhard of any of the charged crimes, the jury need not find that any third party witness observed the assaultive contact between Steenhard and a twin. This instruction correctly stated the law. RCW 9A.44.020(1) provides:

> In order to convict a person of any crime defined in this chapter [9A.44 RCW] it shall not be necessary that the testimony of the alleged victim be corroborated.

RCW 9A.44.083 creates the crime of child molestation in the first degree.

Troy Steenhard argues that, despite the noncorroboration instruction following established law, the jury instruction impermissibly commented on the evidence and erroneously shifted the burden of proof to him. According to Steenhard, jury instruction 1 correctly instructed the jury on how to assess the credibility of witnesses and instruction 1 sufficed for covering all witness testimony, including the testimony of Marlene and Linda. Steenhard highlights that jury instruction 14, the noncorroboration instruction, unfairly emphasized the testimony of the twins and suggested to the jury that factors in weighing the credibility of other witnesses did not apply to the children. According to Steenhard, the instruction posed a danger of the jury concluding that the trial court deemed the twins to be telling the truth. The instruction precluded the option of the jury wanting some corroborating testimony to convict because of some of the fantastical stories uttered by the children. The instruction also suggested that Troy Steenhard's testimony lacked believability since the trial court did not inform the jury that his

17

testimony need not be corroborated. Steenhard underscores that the Washington

Supreme Court Committee on jury instructions recommends against a noncorroboration

instruction. Steenhard also contends that, assuming a trial court may deliver a

noncorroboration instruction, the instruction should add qualifying language such that the

victim's testimony is entitled to no greater weight than other testimony or that the jury

must still employ the beyond a reasonable doubt standard of proof.

We first address the argument that the instruction commented on the evidence. A

statement by the court constitutes a comment on the evidence if the court's attitude

toward the merits of the case or the court's evaluation relative to the disputed issue is

inferable from the statement. *State v. Lane*, 125 Wn.2d 825, 838, 889 P.2d 929 (1995).

But an instruction that accurately states the applicable law is not a comment on the

evidence. *State v. Ciskie*, 110 Wn.2d 263, 282-83, 751 P.2d 1165 (1988); *State v.*

*Hughes*, 106 Wn.2d 176, 193, 721 P.2d 902 (1986).

Despite these principles precluding a court's comment on the evidence,

Washington case law upholds the propriety of a noncorroboration instruction. In *State v.*

*Clayton*, 32 Wn.2d 571, 202 P.2d 922 (1949), the high court addressed use of a

noncorroboration jury instruction in a child sexual abuse case. The instruction read:

> "You are instructed that it is the law of this State that a person
> charged with attempting to carnally know a female child under the age of
> eighteen years may be convicted upon the uncorroborated testimony of the
> prosecutrix alone. That is, the question is distinctly one for the jury, and if
> you believe from the evidence and are satisfied beyond a reasonable doubt

18

as to the guilt of the defendant, you will return a verdict of guilty, notwithstanding that there be no direct corroboration of her testimony as to the commission of the act."

*State v. Clayton*, 32 Wn.2d at 572. The state Supreme Court held that the trial court expressed no opinion as to the truth or falsity of the testimony of the alleged victim or as to the weight that the court attached to her testimony, but properly submitted all questions involving the weight and credibility of the evidence to the jury for its decision.

Since *State v. Clayton*, Washington courts have followed *Clayton*'s holding. *State v. Galbreath*, 69 Wn.2d 664, 419 P.2d 800 (1966); *State v. Chenoweth*, 188 Wn. App. 521, 536-37, 354 P.3d 13 (2015); *State v. Zimmerman*, 130 Wn. App. 170, 182, 121 P.3d 1216 (2005), *remanded on other grounds*, 157 Wn.2d 1012, 138 P.3d 113 (2006). Washington allows the instruction on the rationale that one commits a sex crime rarely in the presence of a third person. *State v. Galbreath*, 69 Wn.2d at 670.

Despite affirming the validity of a noncorroboration jury instruction, we hold the same misgivings over the instruction expressed by this court in *State v. Zimmerman*, 130 Wn. App. 170 (2005), by Judge Becker concurring in *State v. Chenoweth*, 188 Wn. App. at 538 (2015), and by other jurisdictions. The Washington Supreme Court Committee on jury instructions recommends against giving noncorroboration instructions:

The matter of corroboration is really a matter of sufficiency of the evidence. An instruction on this subject would be a negative instruction. The proving or disproving of such a charge is a factual problem, not a legal

19

problem.  Whether a jury can or should accept the uncorroborated testimony of the prosecuting witness or the uncorroborated testimony of the defendant is best left to argument of counsel.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL §

45.02, cmt., at 917 (4th ed. 2016).  The Indiana Supreme Court found the no-

corroboration instruction misleading because:

> Jurors may interpret this instruction to mean that baseless testimony should be given credit and that they should ignore inconsistencies, accept without question the witness's testimony, and ignore evidence that conflicts with the witness's version of events.

*Ludy v. State*, 784 N.E.2d 459, 462 (Ind. 2003).  The Florida Supreme Court commented:

> It cannot be gainsaid that any statement by the judge that suggests one witness's testimony need not be subjected to the same tests for weight or credibility as the testimony of others has the unfortunate effect of bolstering that witness's testimony by according it special status.  The instruction in this case did just that, and in the process effectively placed the judge's thumb on the scale to lend an extra element of weight to the victim's testimony.

*Gutierrez v. State*, 177 So. 3d 226, 231-32 (Fla. 2015).

Troy Steenhard also argues that the noncorroboration instruction subtly shifts the

burden of proof by suggesting a different standard applies to other witnesses, including

himself.  According to Steenhard, a jury may consider his testimony, unlike Marlene and

Linda's testimony, worthless unless corroborated.  Steenhard fails to cite any authority

for this assertion, however.  We do not consider conclusory arguments unsupported by

citation to authority.  *Joy v. Department of Labor & Industries*, 170 Wn. App. 614, 629,

No. 35578-1-III
*State v. Troy Steenhard*, *aka Bloor*

285 P.3d 187 (2012).

Vouching

Troy Steenhard next argues that testimony affirming the honesty of Marlene and Linda violated his right to a fair trial. He refers to Molly Tresh's and Leah Bias' testimony that Linda and Marlene tell the truth. He argues that an opinion on the twins' credibility amounted to an opinion on guilt and caused actual prejudice to him. Steenhard asserts that the prosecutor committed misconduct when he inquired whether the twins were honest and, because his defense counsel failed to object, he suffered ineffective assistance of counsel. He also avows manifest constitutional error.

During examination of Molly Tresh by the prosecution, Tresh declared that her twins, if given the chance, will tell the truth. They will not lie. Leah Bias testified that both Marlene and Linda are honest girls.

No reliable test for truthfulness exists, such that a witness is not qualified to judge the truthfulness of a child's story. *United States v. Azure*, 801 F.2d 336, 341 (8th Cir. 1986); *State v. Dunn*, 125 Wn. App. 582, 594, 105 P.3d 1022 (2005). This rule particularizes the general rule that no witness may give an opinion on another witness' credibility. *State v. Neidigh*, 78 Wn. App. 71, 76-77, 895 P.2d 423 (1995); *State v. Wright*, 76 Wn. App. 811, 821-22, 888 P.2d 1214 (1995); *State v. Suarez-Bravo*, 72 Wn. App. 359, 366, 864 P.2d 426 (1994); *State v. Padilla*, 69 Wn. App. 295, 299, 846 P.2d 564 (1993); *State v. Walden*, 69 Wn. App. 183, 186-87, 847 P.2d 956 (1993); *State v.*

21

*Smith*, 67 Wn. App. 838, 846, 841 P.2d 76 (1992); *State v. Stover*, 67 Wn. App. 228, 231, 834 P.2d 671 (1992); *State v. Casteneda-Perez*, 61 Wn. App. 354, 362, 810 P.2d 74 (1991). Lay opinion of the truthfulness of another is not helpful within the meaning of ER 701, because the jury can assess credibility as well or better than the lay witness. *State v. Carlson*, 80 Wn. App. 116, 123, 906 P.2d 999 (1995).

In most sexual abuse cases, the respective credibility of the victim and the defendant becomes crucial because the testimony of each directly conflicts and the two are the only percipient witnesses. *State v. Alexander*, 64 Wn. App. 147, 154, 822 P.2d 1250 (1992); *State v. Fitzgerald*, 39 Wn. App. 652, 657, 694 P.2d 1117 (1985). Therefore, declaring the victim to be telling the truth in essence marks the defendant with guilt. Opinions on guilt are improper whether made directly or inferentially. *State v. Quaale*, 182 Wn.2d 191, 199, 340 P.3d 213 (2014); *State v. Montgomery*, 163 Wn.2d 577, 594, 183 P.3d 267 (2008).

Troy Steenhard did not object at trial to Molly Tresh's or Leah Bias' vouching for the truthfulness of the twins. Failure to object to the admissibility of evidence at trial precludes appellate review of that issue unless the alleged error involves manifest error affecting a constitutional right. *State v. Lynn*, 67 Wn. App. 339, 342, 835 P.2d 251 (1992); *State v. Stevens*, 58 Wn. App. 478, 485-86, 794 P.2d 38 (1990). The Washington Supreme Court has issued several formulations for manifest constitutional error, one of which is the showing of prejudice. *State v. Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d

22

125 (2007).  Along these lines, manifest constitutional error involves a constitutional

error that had practical and identifiable consequences in the trial of the case.  *State v.*

*Lynn*, 67 Wn. App. at 345 (1992).

Vouching creates constitutional ramifications.  Lay witness testimony about the

victim's credibility implicates the accused's guilt or innocence and thus implicates the

accused's right to a fair trial and impartial jury under article I, section 21 of the

Washington State Constitution and the Sixth Amendment to the United States

Constitution.  *State v. Johnson*, 152 Wn. App. 924, 934, 219 P.3d 958 (2009).  The

admission of testimony vouching for a witness is constitutional error because such

evidence violates the defendant's constitutional right to a jury trial, which includes the

independent determination of the facts by the jury.  *State v. Quaale*, 182 Wn.2d at 199

(2014); *State v. Kirkman*, 159 Wn.2d at 927 (2007); *State v. Florczak*, 76 Wn. App. 55,

74, 882 P.2d 199 (1994).  Vouching testimony is also manifest error because the

erroneous evidence actually affects an accused's right to a fair trial.  *State v. Johnson*,

152 Wn. App. at 934.

Four Washington decisions entail reversals of convictions because of vouching for

the credibility of a witness.  In *State v. Sutherby*, 138 Wn. App. 609, 158 P.3d 91 (2007),

*aff'd on other grounds*, 165 Wn.2d 870, 204 P.3d 916 (2009), a jury convicted Randy

Sutherby of child rape and child molestation, among other charges.  This court reversed

because the trial court allowed the victim's mother to testify that her daughter was telling

the truth. The mother stated she could determine if her daughter lied because of a half-smile that appeared on the child's face on prevarication. The mother impliedly suggested to the jury to judge the daughter's truthfulness, when the daughter testified before the jury, by her facial expression.

In *State v. Alexander*, 64 Wn. App. 147 (1992), the prosecution questioned the victim's counselor, David Bennett, about whether the victim gave any indication that she was lying about the abuse. Bennett testified he did not believe the victim lied. This court reversed the conviction of Robert Alexander for child rape. By declaring the victim to be speaking the truth, Bennett essentially opined on the guilt of Alexander. An expert's opinion as to the defendant's guilt invades the jury's exclusive function to weigh the evidence and determine credibility. Without analysis, this court also concluded that the error, combined with other error, was not harmless beyond a reasonable doubt.

Another important decision is *State v. Dunn*, 125 Wn. App. 582 (2005). This court reversed another conviction for rape of a child on the ground of inadmissible testimony. Physician's assistant James Kramer testified that, despite an absence of any physical evidence of rape, he concluded that sexual abuse occurred because of the detailed story told him by the victim. The impermissible testimony was prejudicial because the only evidence of sexual abuse was the child's own testimony and hearsay statements to others. The evidence was sufficient to convict Larry Dunn of rape, but still not harmless. The trial presented a credibility contest between the alleged victim and the

24

accused.

A final compelling decision is *State v. Johnson*, 152 Wn. App. 924 (2009). The State charged Gerald Johnson with child molestation. His trial counsel failed to object to impermissible opinion testimony. The jury heard testimony that Johnson's wife believed the story of the victim. The court held the testimony to be reversible and manifest constitutional error. The testimony invaded Johnson's right under article I, section 2 of the Washington Constitution for a fair trial before an impartial jury.

The State relies on *State v. Warren*, 134 Wn. App. 44, 138 P.3d 1081 (2006), *aff'd*, 165 Wn.2d 17, 195 P.3d 940 (2008). For the first time on appeal, Richard Warren argued that the testimony of the forensic interviewer and a detective improperly vouched for the child victim's credibility and violated his right to a jury trial. Two forensic witnesses testified that, when interviewing the child, each discussed the importance of telling the truth and asked the child to describe the meaning of telling the truth compared to a lie. Each child promised to tell the truth. This court held that the testimony by the witnesses stating their belief that the alleged child molestation victim could distinguish a truth from a lie was not manifest constitutional error. We note that neither witness testified that she believed the victim was telling the truth or simply that the witness was honest.

The State argues that Molly Tresh merely testified whether Marlene and Linda would tell the truth during the forensic interview. We disagree. Tresh declared, in part, that neither daughter would lie without limiting their honesty to any particular subject.

The State contends and the dissent agrees that neither Molly Tresh nor Leah Bias expressed an opinion on the children's truthfulness about the accusations against Troy Steenhard or that she believed the accusations. We agree with regard to Leah Bias' testimony. But no Washington decision holds that vouching for a witness' honesty violates the accused's rights only if the vouching relates to the subject of the prosecution. Anyway Tresh's testimony implied that neither daughter would falsely accuse Steenhard of molestation. Tresh testified that her daughters would tell the truth in response to a question of whether Tresh had concern that the twins would falsely accuse Steenhard.

Since we find manifest constitutional error, we must determine whether Troy Steenhard establishes actual prejudice. Steenhard relies on *State v. Jerrels*, 83 Wn. App. 503, 925 P.2d 209 (1996). The jury found Harvey Jerrels guilty of multiple child sex offenses involving his daughter and stepdaughters. At trial, the prosecutor asked the mother of the alleged victims whether she believed the children were telling the truth. The prosecutor asked the question three times and each time the mother stated she believed the kids were telling the truth. The *Jerrels* court noted that a jury will not easily disregard a mother's opinion as to her children's veracity even if instructed to do so.

Some factors weigh in favor of finding no prejudice to Troy Steenhard. Marlene,

but not Linda, testified in person. Marlene, at the questioning of the State, explained that she knows the difference between the truth and a lie. Two children, not one child, accused Steenhard of sexual assaults.

We deem counterweighing factors compelling and thereby find prejudice. Troy Steenhard was rarely, and perhaps never, alone in his house with Marlene and Linda. We recognize that children may often mix fantasy with reality, but both children invented some stories or details about the purported sexual abuse. We recognize that molestation may occur without any physical markings, but still no physical findings confirmed the girls' stories. As in *State v. Jerrels*, the mother of the twins vouched for the honesty of the daughters. Another witness also vouched for the credibility. Finally, we return to the noncorroboration jury instruction. This instruction suggested to the jury that the girls' testimony, and not Troy Steenhard's testimony, could prevail without verification from another witness.

Because we hold that Troy Steenhard suffered harm from manifest constitutional error, we do not address whether the prosecutor committed misconduct. We also do not review whether Steenhard's trial counsel performed ineffectively.

Harmless Error

Even though we conclude that Troy Steenhard suffered prejudice from the vouching to the honesty of witnesses, we must still perform a harmless error analysis. *State v. Kirkman*, 159 Wn.2d at 927 (2007). Constitutional error is harmless only if the

State established beyond a reasonable doubt that any reasonable jury would have reached the same result absent the error. *State v. Quaale*, 182 Wn.2d at 202 (2014). The untainted evidence must be so overwhelming that it leads necessarily to a finding of guilt. *State v. Thach*, 126 Wn. App. 297, 313, 106 P.3d 782 (2005). Based on the same factors under which we conclude that Troy Steenhard suffered prejudice from manifest constitutional error, we find, under the constitutional standard, the error to be harmful.

## CONCLUSION

We reverse the conviction of Troy Steenhard for rape of a child in the first degree with instructions for the trial court to dismiss the charge. We reverse the convictions of Steenhard for child molestation in the first degree, and we remand for a new trial on the two charges.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Fearing, J.
_____
Fearing, J.

I CONCUR:

Siddoway, J.
_____
Siddoway, J.

28

No. 35578-1-III

PENNELL, A.C.J. (dissenting) — I agree with the majority that the State's evidence was insufficient to prove the crime of first degree rape of a child, as set forth in the court's jury instructions. I also share the majority's concerns regarding the propriety of a noncorroboration instruction. Where I disagree with the majority is in its assessment of vouching.

It is first important to unpack what is meant by the term "vouching." Not all evidence touching on the issue of a witness's truthfulness constitutes improper vouching. This is especially true in the context of crimes against children, where the prosecution's case depends on child testimony. When a defendant challenges the credibility of a child witness, the prosecution may present responsive evidence in order to rehabilitate the witness's credibility. *State v. Petrich*, 101 Wn.2d 566, 683 P.2d 173 (1984), *overruled in part on other grounds by State v. Kitchen*, 110 Wn.2d 403, 406 n.1, 756 P.2d 105 (1988). This may involve demonstrating that the child is competent and capable of providing truthful testimony. *State v. Froehlich*, 96 Wn.2d 301, 307, 635 P.2d 127 (1981); *United States v. Azure*, 801 F.2d 336, 340 (8th Cir. 1986) (A jury may properly receive testimony "about a child's ability to separate truth from fantasy."). Or, the prosecution

may be permitted to present evidence of a child witness's character for truthfulness under ER 608. *See United States v. Lukashov*, 694 F.3d 1107, 1117 (9th Cir. 2012). Such methods of rehabilitation are proper and do not amount to vouching.

Vouching is different from mere rehabilitation. "Improper vouching occurs when the prosecutor expresses a personal belief in the veracity of a witness or indicates that evidence not presented at trial supports the testimony of a witness." *State v. Thorgerson*, 172 Wn.2d 438, 258 P.3d 43 (2011) (citing *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010)). Vouching has constitutional implications because it impairs a defendant's due process right to have a jury determine guilt based on evidence presented in court. *See Darden v. Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986); *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007). "Whether a witness testifies truthfully is an issue entirely within the province of the trier of fact." *Thorgerson*, 172 Wn.2d at 443.

There are two forms of vouching: direct vouching by the prosecutor and indirect vouching through the prosecution's witnesses. Direct vouching can occur when the prosecutor provides personal assurances of a witness's veracity. *State v. Brett*, 126 Wn.2d 136, 175, 892 P.2d 29 (1995). Or the prosecutor may suggest that evidence outside the record supports the witness's credibility. *See United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980) (insinuation that cooperating witness was believable

2

No. 35578-1-III
*State v. Steenhard aka Bloor* (Dissent)

because his testimony was pursuant to a plea agreement and was being monitored by law enforcement).

Indirect vouching occurs when a prosecution witness testifies as to the truthfulness of another witness's testimony. *State v. Korum*, 157 Wn.2d 614, 651, 141 P.3d 13 (2006); *State v. Chavez*, 76 Wn. App. 293, 299, 884 P.2d 624 (1994). As is true of direct vouching, indirect vouching can occur through personal assurances. *See Maurer v. Dep't of Corr.*, 32 F.3d 1286, 1288-89 (8th Cir. 1994) (Four witnesses, two law enforcement officers, and two associates testified the victim "seemed sincere" when she said she had been raped.). Or it can happen when a witness indicates that another witness should be believed based on information not available to the jury. *See Snowden v. Singletary*, 135 F.3d 732, 737-38 (11th Cir. 1998) (expert testimony that 99.5 percent of children tell the truth about abuse).

In some instances, indirect vouching can take the form of both a direct personal assurance and a reference to information outside the record. For example, in *State v. Sutherby*, 138 Wn. App. 609, 158 P.3d 91 (2007), the victim's mother was called as a witness in a child rape case. The mother testified that the victim had a "tell"[1]—a special

---

[1] A "tell" is defined in pertinent part as "an inadvertent behavior or mannerism that betrays a poker player's true thoughts, intentions or emotions[. . . . It is also] a revealing gesture, expression, etc. that is likened to a poker player's tell." MERRIAM-WEBSTER UNABRIDGED, http://unabridged.merriam-webster.com/unabridged/tell (last visited July 18, 2019).

3

kind of half smile—that she exhibited when she was lying. *Id.* at 616. The prosecution asked if the victim ever exhibited this "['tell'] when she was talking about what happened" with the defendant. *Id.* at 617. The mother replied, no. *Id.* The mother's testimony was improper for two reasons: (1) expressing the mother's belief that the victim's accusations against the defendant were truthful, and (2) conveying a test for assessing the victim's allegations that was outside the jury's ability to evaluate—i.e., whether the victim did in fact have a tell and whether the tell was exhibited during prior conversations about the defendant's alleged misconduct. *Id.*

The danger with vouching, as opposed to other forms of testimony touching on witness credibility, is that it may lead jurors to "surrender their own common sense in weighing testimony," *United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973) and defer to the government's perceived expertise when it comes to matters of guilt or innocence.

The majority claims two statements elicited from the State's witnesses constituted impermissible vouching. The first statement came from the victims' mother. When asked whether she had any concerns about the possibility of her children making false accusations to law enforcement, the mother stated, "No, no. I knew that my children—I mean, if given the opportunity, they're going to tell the truth. They're not going to lie. They don't even understand what they're even saying in regards to any type of that."

4

3 Report of Proceedings (RP) (June 28, 2017) at 467.[2] The second statement came from

the mother's friend. When asked if the two victims were honest girls, the friend

responded affirmatively. *Id.* at 538-39.

Neither statement is a manifestly clear example of vouching. The statements did

not convey the witnesses' personal beliefs regarding the accuracy of the victims'

accusations against Troy Steenhard. Nor did the statements suggest that the victims'

allegations had been validated by some sort of analysis that was outside the evidence

presented at trial. Although the victims' mother and friend touched on issues of

truthfulness, their testimony went primarily to the issues of the victims' capacity and

character for truthfulness. While there may have been evidentiary problems with the

prosecution's introduction of such evidence, such errors are not the same thing as

improper vouching.

Without a manifestly clear example of vouching, Mr. Steenhard's unpreserved

objection to the testimony from the State's witnesses does not merit appellate scrutiny.

---

[2] Prior to this statement, the prosecutor had elicited testimony from the mother regarding her efforts to avoid influencing the children's testimony prior to their participation in forensic interviews. 3 RP (June 28, 2017) at 466-67. The prosecutor then asked, "Did you have any concerns about helping to make some kind of a false allegation?" *Id.* at 467. The mother responded, "Pardon me?" *Id.* The prosecutor then asked, "Did you have some kind of—any concerns about the possibility of making a false accusation against [Troy] Steenhard." *Id.* Given this context, it appears the prosecutor was primarily concerned with whether the mother had done anything to influence her children's credibility. Nevertheless, the mother's response was of a more general nature.

*Kirkman*, 159 Wn.2d at 936 ("'Manifest error' requires a nearly explicit statement by the witness that the witness believed the accusing victim."). This case is therefore not one of the rare circumstances where a conviction should be reversed based on unpreserved constitutional error. RAP 2.5(a).

Nor is Mr. Steenhard's conviction subject to reversal under the theory that defense counsel performed ineffectively by failing to assert a vouching objection. A claim of ineffective assistance of counsel requires showing both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687-88, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Neither burden is met here. First, defense counsel's failure to object was not necessarily deficient. After all, an objection may have simply prompted the prosecution to spend more time on the issue of the victims' credibility in order to lay a proper foundation for evidence of capacity or character for truthfulness. *State v. McNeal*, 145 Wn.2d 352, 362-63, 37 P.3d 280 (2002) (Reasonably strategic trial decisions do not qualify as deficient.). In addition, the testimony at issue was not prejudicial when viewed in light of the evidence as a whole. During the defense case-in-chief, both Mr. Steenhard and one of his witnesses acknowledged that the two child victims were not prone to lying. 4 RP (July 5, 2017) at 728; 4 RP (July 6, 2017) at 768. Thus, even if the testimony of the mother and her friend had been excluded, the jury still would have been presented with evidence of the victims' truthful character. In addition, during the State's case, the victims' mother acknowledged that she sometimes had to discipline her children for

6

No. 35578-1-III
*State v. Steenhard aka Bloor* (Dissent)

lying. 3 RP (June 28, 2017) at 464. This testimony neutralized the mother's later testimony about her children's ability to tell the truth.

In the end, the testimony at issue in this case did not deprive Mr. Steenhard of his right to a fair trial. Nothing about the testimony from the victims' mother or her friend jeopardized the jury's ability to critically assess the State's evidence and make an independent determination of guilt. Particularly when it comes to the type of accusations at issue here, jurors can be expected to understand that a mother is not an unbiased witness. The same holds true for the mother's friends. The jury's unanimous verdict of guilt beyond a reasonable doubt is not so fragile that it is undermined by the type of unpreserved error at issue in this case. I would affirm Mr. Steenhard's two convictions for first degree child molestation.

_____, A.C.J.
Pennell, A.C.J.

7